IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>RODNEY BEDENFIELD | No. 14 CR 330-10<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Rodney Bedenfield and nine co-defendants were charged in a 19-count indictment for their respective roles in a drug trafficking organization operating on Chicago's west side. On September 14, 2015, Bedenfield pled guilty to one count of conspiracy to distribute one kilogram or more of heroin, four counts of distribution of heroin, and one count of possession with intent to distribute over 100 grams of heroin. He then proceeded to bench trial on the remaining counts against him: namely, being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and possessing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Having considered the witness testimony and other evidence presented at trial and having assessed witness credibility, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

**I. Findings of Fact**

On June 10, 2014, Officer Homero Ramirez was surveilling Bedenfield's residence at 2103 South Spaulding Avenue in Chicago as part of a long-term investigation of Bedenfield and a number of other individuals. On this particular day, Ramirez had received information from a wiretap of Bedenfield's phone that Bedenfield would be moving contraband from that location. Bedenfield was told by an acquaintance during phone calls made at 12:16 p.m., 12:20 p.m., and 12:38 p.m. that police were going to search ten to twelve houses within the next month and that

1

Bedenfield needed to "cut it out and clean it up." About an hour later, at 1:41 p.m., Bedenfield exited the front gate of the Spaulding property with a large black plastic bag and two smaller bags. Bedenfield held the large bag at his waist with both hands and carried it across the street to a blue car using his right foot to assist him in supporting the bottom of the bag. The large bag was opaque, but contained a square-shaped object in the bottom with a tubular object leading to the top where Bedenfield was choking it at the top of the bag. When Bedenfield reached the car, he placed the large bag in the trunk and the two smaller bags in the back seat. He then drove to the next block, to 2111 South Christiana Street in Chicago, where he removed the large bag from the trunk and carried it up the front stairs of the Christiana residence. The Christiana residence was owned by Bedenfield's childhood friend Reginald Sanders.

Sanders had two storage sheds beneath the back porch of the Christiana residence that he allowed Bedenfield to use beginning in 2013. Sanders thought Bedenfield would use the storage sheds to store heroin but gave him permission because they were friends and he was not using them. Sanders gave Bedenfield keys to the house's side gate and the two sheds, all of which were kept locked. In June 2014, the only individuals with keys to the sheds were Bedenfield, Sanders, and Sanders' wife. Sanders and his wife were the only people that lived at the residence during that time and they did not use the sheds for anything other than long-term storage of garden material and floor tile and one-time storage of materials used to install a bathtub.[1] Sanders did not store firearms or ammunition in the sheds and he did not allow anyone else to store firearms or ammunition in there either.

---

[1] Bedenfield insists that the contractors installing the bathtub had independent access to the shed. The Court disagrees. Sanders testified at both the trial and before the grand jury that the contractors did not have keys to the sheds and that he personally let them into the north shed on the few occasions they needed materials from there. Sanders had multiple opportunities during his testimony to clarify whether the contractors had keys to the sheds and he consistently maintained that they did not. His testimony on this point was not evasive; his demeanor and tone were indicative of truthfulness.

At 8:29 a.m. on June 11, 2014, Bedenfield called Sanders. He asked Sanders to bring him "a pair of shoes" and let him know how many pairs of shoes without "red strings" were in storage. According to both Sanders and Bedenfield (who provided a post-arrest statement to Officer Martin Summerville), "pair of shoes" was code for a bag containing a certain amount of narcotics. Over the course of Bedenfield's use of the sheds, he asked Sanders "a few times" to check on his heroin and let him know how many bags of heroin were stored in the garbage can in the north shed; he never asked Sanders to check the south shed.

Around 9:00 a.m. on June 11, 2014, Sanders entered the north storage shed and began looking inside the garbage can for Bedenfield's heroin. In a call between Sanders and Bedenfield, Sanders expressed difficulty locating the heroin and said: "You got shit everywhere, bro. You need to organize the shit." Bedenfield responded that he knew where things were and that it was just Sanders that did not. Bedenfield eventually directed Sanders to the precise location of the heroin, which was stored in a plastic bag inside a shoebox inside the garbage can. Sanders informed Bedenfield that there were four regular bags and one bag with a red string around it inside the bag. In the course of his search for the heroin, Sanders looked in all of the plastic bags that he saw in the garbage can, but did not look inside the backpack. He did not see any firearms while looking for the narcotics. At Bedenfield's request, Sanders took one bag of heroin out of the garbage can, wrapped it in a white plastic bag, and drove it to Bedenfield at Bedenfield's grandmother's house, 1638 South Trumbull Avenue, Chicago. Sanders gave the bag to Bedenfield and then drove away from the Trumbull residence.

The next day, on June 12, 2014, approximately eight officers arrived at the Christiana residence to execute a search warrant on the second-floor apartment. The officers knocked, announced, and then forced entry into the apartment where they found Sanders and his wife. The

3

officers recovered a .22 caliber handgun and four proofs of residency inside the apartment. Sanders was immediately taken into custody for possessing a weapon without a FOID card. Then, Sanders and his wife both provided written consent for the officers to search the basement and sheds attached to the basement. Sanders provided a key to the north shed; he provided oral consent for the officers to force entry into the south shed.

Inside the north shed, the officers found a large garbage can. Inside the garbage can was a shoebox with a black plastic grocery bag containing narcotics. There were no weapons in that bag; the weapons were found in the trash can in canvas and plastic bags above the shoebox. In addition to the weaponry, the officers recovered a money counter, two heat sealers, a blender, two containers of lactose, baggies containing heroin, narcotics packaging, and three digital scales.[2] Officer Chris Labno, testifying as a narcotics trafficking and firearms expert under Rule 702, testified that these materials are commonly used by heroin traffickers to prepare for heroin distribution. He further testified that guns are most useful to drug traffickers if they are in a location where they are needed; for example, guns are often stored near where an individual is conducting the narcotics business, the heroin trafficking, the heroin storage, or where other tools of the trade like grinders and money counters are stored.

After the officers searched the north storage shed, they then went to the south shed, which was locked. Sanders gave verbal consent for the officers to force entry into the south shed,

---

[2] Officer Daniel Villa placed a hold on this evidence pending investigation. Despite that hold, the heat sealers, bill counter, box of baggies, two boxes of ammunition, and other non-drug or gun evidence were destroyed. The Court notes that Bedenfield did not seek to suppress any items that were recovered in the search of the storage sheds, including the items that were destroyed. At the start of trial, the Court provided Bedenfield an opportunity—with the consent of both parties—to present evidence on the merits of the case as well as on Fourth Amendment issues regarding the suppression of evidence. Following the testimony of the third witness, however, Bedenfield's attorney informed the Court that he was not seeking to suppress the evidence. Instead, he was only objecting to the weight afforded the evidence. In a thorough exchange between the Court and Bedenfield, the Court explicitly asked Bedenfield's attorney: "Are you not moving to suppress all of the evidence? Are you moving to suppress the long gun that was in the locker on the south side? Are you moving to suppress any of the weapons? Or are you just saying they can't prove beyond a reasonable doubt that he possessed them and that he possessed them in furtherance of a drug trafficking activity?" The attorney responded: "The latter is correct." Based on counsel's representations to the Court, the Court has weighed this evidence without inquiring into whether it should be suppressed.

which they did. Inside, the officers found a large black plastic bag that contained an assault rifle, clips for the assault rifle, and ammunition for a different gun that was not recovered. There were no controlled substances found in the south storage shed. Officers ordered fingerprints on all of the guns that were seized, but no fingerprints were found on the weapons. Fingerprints were not ordered on the bags containing the guns.

At trial, the parties stipulated that officers recovered the following guns that had traveled in interstate commerce prior to June 12, 2014 from the storage sheds: a loaded Glock Model # 25 .40 caliber blue steel semi-automatic handgun, bearing serial number FUY 879; a loaded Pietro Baretta Model #92F 9mm blue steel semi-automatic handgun, bearing serial number D824212; a loaded Daewoo Precivion Ind Model #DP21 9mm blue steel semi-automatic handgun, bearing serial number 06589; a Sig Sauer Model #P6 9mm chrome semi-automatic handgun, bearing serial number M484045; a Smith and Wesson .40 caliber blue steel semi-automatic handgun, bearing no serial number; and a loaded Essential Arms Inc. Model #J15 .223 blue steel rifle, bearing serial number 040535. The rifle was recovered in the south shed; the other weapons were recovered in the trash bin in the north shed. The parties also stipulated that prior to June 2014 Bedenfield had been convicted of a crime punishable by a term of imprisonment exceeding one year.

At his change of plea, Bedenfield admitted that he agreed to supply Kenneth Shoulders with one or more kilograms of heroin between June 2013 and June 12, 2014. He also pled guilty to distributing heroin on March 4, 2014, April 1, 2014, April 8, 2014, June 2, 2014, and June 12, 2014. With respect to the June 12, 2014 transaction, Bedenfield averred that: "On June 12th, the government discovered inside a garbage can inside a storage shed behind a house located at 21st

and Christiana Avenue in Chicago plastic baggies in white plastic containers, which contained heroin that he intended to distribute…"

## II. Conclusions of Law

### A. Felon in Possession of a Firearm

Count 18 of the indictment charges Bedenfield with unlawfully possessing a firearm in violation of Section 922(g)(1) of Title 18. To establish guilt under this section, the government must prove beyond a reasonable doubt that "(1) the defendant has a previous felony conviction, (2) the defendant possessed the firearm or ammunition, and (3) the firearm or ammunition had traveled in or affected interstate or foreign commerce." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012); 18 U.S.C. § 922(g)(1). In this case, the first and third elements were proven by stipulation. The subject firearms had travelled in interstate commerce and, prior to June 2014, Bedenfield had been convicted of a crime punishable by a term of imprisonment exceeding one year. The Court now considers whether Bedenfield possessed the six charged firearms.

"Possession in this context can be actual or constructive," *Griffin*, 684 F.3d at 695, and may be proven by either direct or circumstantial evidence, *United States v. Arnold*, 486 F.3d 177, 181 (7th Cir. 2007). Actual possession requires proof that the defendant had "immediate physical possession or control of a firearm." *Griffin*, 684 F.3d at 695. In this case, Bedenfield did not actually possess the firearms in question. The government provided no evidence that Bedenfield actually possessed the five firearms recovered from the north shed and the evidence regarding the rifle found in the south shed is insufficient to demonstrate actual possession.

Bedenfield was overheard on the wire suggesting that he was going to move contraband from his house because the authorities were coming, but no one actually observed him remove contraband from his house shortly after those calls. Of course, Officer Ramirez did observe

Bedenfield remove a large black bag and two smaller bags from his house. He could make out a square object in the bottom of the large bag and a tubular part leading to the top of the bag where Bedenfield was holding it, but he could not specifically make out what was inside the bag. The Court cannot, without more, infer that the tubular object inside the black bag was the rifle that was recovered; too many facts or factual omissions cast reasonable doubt on Bedenfield's actual possession of the rifle.

In addition to the surveilling officer's inability to see the contents of the large black bag, Bedenfield was only observed going up the stairs to the Christiana residence with that bag after transporting it from his house. There is no evidence that he left the Christiana residence empty handed, with firearms, or with another bag; there is no evidence that he even entered the building at that time. These gaps become problematic because the government admitted in its closing argument that officers discovered a "significant amount of ammunition including 79 rounds that go to a different semi-automatic rifle that was not recovered" in the same shed as the recovered rifle. This means that there may have been not just one, but two semi-automatic rifles connected to the south shed. Moreover, although Ramirez testified that the black bag recovered from the south shed was similar to the one he saw Bedenfield carrying out of his residence, there is no other evidence that this was the specific bag that had been transported. There are other black plastic bags in the pictures produced of the storage sheds and the Court is unable to determine whether the bag discovered in the south shed is the same bag that was transported by Bedenfield from his residence two days earlier. Had Bedenfield dropped off the black bag of materials and left the residence empty handed, never to return to the Christiana residence before the officers searched the sheds two days later, an inference of actual possession may have been plausible; as it stands, no such inference is made by the Court.

The Court, therefore, turns next to constructive possession. Constructive possession requires evidence that the defendant "knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *Id*. (internal citation and quotation marks omitted). To establish constructive possession, "the government must prove a nexus between the defendant and the relevant item to separate true possessors from mere bystanders." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). This nexus is usually shown by demonstrating that the defendant had "exclusive control" over the property where the contraband was discovered or, in the absence of "exclusive control," by demonstrating that the defendant had a "substantial connection" to the location where the contraband was seized. *Griffin*, 684 F.3d at 695 (7th Cir. 2012).

The Court finds beyond a reasonable doubt that Bedenfield had constructive possession of the five firearms recovered from the trash can in the north shed. In addition to the firearms recovered in that trash can, officers also seized baggies containing heroin that Bedenfield pled guilty to possessing with the intent to distribute. Bedenfield, by his own admission, possessed the heroin found in immediate proximity to the weapons now being challenged with the intent to sell it.

Moreover, the June 11, 2014 recorded conversations between Sanders and Bedenfield clearly indicate that Bedenfield alone had knowledge about the contents of that trash can and exercised exclusive control over them. Around 9:00 a.m. on June 11, 2014, Sanders entered the north storage shed and began looking inside the garbage can for Bedenfield's heroin at Bedenfield's request. In a call made during that search, Sanders expressed difficulty locating the heroin. Bedenfield maintained that he knew where everything was and he eventually directed Sanders to the precise location of the heroin, which was stored in a plastic bag inside a shoebox

inside the garbage can. Bedenfield was obviously responsible for the items in the trash can. Sanders may have had access to the garbage can, but it was Bedenfield that expressed absolute control and dominion over its contents. The evidence shows beyond reasonable doubt that Bedenfield constructively possessed the five recovered guns recovered from the trash can in the north shed. *See, e.g., United States v. Alanis*, 265 F.3d 576 (7th Cir. 2001) (affirming finding defendant in constructive possession of gun recovered from nightstand next to his bed where his eyeglasses, clothing, and wallet were nearby); *United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995) (affirming jury verdict finding constructive possession of weapon where defendant denied living at residence where weapon was found, but had been observed at the residence on a number of occasions, provided the phone number of the house to acquaintances, and had stated he lived at the residence on other occasions).

The government did not prove beyond a reasonable doubt, however, that Bedenfield constructively possessed the rifle recovered in the south shed. First, there is the issue of who had access to the south shed. Bedenfield, Sanders, and Sanders' wife all had keys to the south shed, but the Sanderses never provided a key to police the day the south shed was searched; the police forced entry. There was no explanation as to why such force was necessary and the Court was left to wonder at whether Sanders lost his key, destroyed his key, or affirmatively chose not to provide it. Similarly, there was no evidence whatsoever with respect to the key possessed by Sanders' wife.

In addition to not knowing exactly who had access to that south shed, there is also considerable doubt as to whether Bedenfield had a "substantial connection" to that shed. The government insists that Bedenfield exercised "both direction and control" over the firearms, but the evidence belies such a finding with respect to the rifle. Sanders provided only generic

9

testimony about Bedenfield accessing the storage sheds over the course of the prior year and there was no evidence that Bedenfield ever accessed the south shed specifically. Indeed, there was no evidence tying Bedenfield to that south shed except that he had a key to it and that alone is not enough. As already discussed, there is reasonable doubt as to whether the item Bedenfield carried to the Sanders' home on June 10, 2014 was a rifle and there is considerably more doubt as to whether he eventually carried that item, or any other items, to the south shed. *See, e.g., Griffin*, 684 F.3d 691 (reversing jury verdict that found constructive possession where defendant may have had substantial connection to residence, but not to the specific weapons recovered); *United States v. Windom*, 208 F.3d 626 (7th Cir. 1994) (finding constructive possession not established where only connection between the defendants and contraband were their simultaneous presence in same house). The Court finds that the government failed to carry its burden with respect to the rifle. Possession of only one weapon, however, is sufficient to convict on this charge. *See United States v. Block*, 718 F.3d 638, 643 (7th Cir. 2013) ("[A] single act of possession can yield only one conviction under § 922(g) even if the defendant possessed multiple firearms at the same time."). The Court, therefore, finds Bedenfield guilty of Count 18.

### B. Possession of a Firearm in Furtherance of a Drug Trafficking Crime

Count 19 of the indictment charges Bedenfield with violating Section 924(c)(1)(A) of Title 18. To establish guilt under this section, the government must prove beyond a reasonable doubt that (1) the defendant knowingly possessed a firearm and that (2) his possession of that firearm was in furtherance of (3) a drug-trafficking offense. *See United States v. Duran*, 407 F.3d 828, 839 (7th Cir. 2005). With respect to this count, the government again charged the five guns found in the north shed of the Christiana residence and the rifle found in the south shed. The Court already found reasonable doubt as to whether Bedenfield possessed the rifle, which means

that the first element of this offense cannot be satisfied with respect to the rifle. The first and third elements have, however, been satisfied with respect to the five firearms recovered in the north shed. As already discussed, Bedenfield constructively possessed those firearms and he pled guilty to the drug trafficking offense charged in Count 17 of the indictment. The only remaining issue is whether Bedenfield's possession of the five firearms was "in furtherance" of the drug trafficking offense.

The "in furtherance of" element of Section 924(c) requires "that the weapon further, advance, move forward, promote or facilitate the drug-trafficking crime, and that the possessed gun further a drug-trafficking offense by providing the dealer, his stash, or his territory with protection." *United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012). Mere proximity of a firearm and the location where drugs are stored or sold is not enough to satisfy this test; instead, the government must establish that there is "some nexus between the firearm and the drug-selling operation." *Id*. In evaluating whether a nexus exists, the Court may consider a number of factors, including: "(1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of weapon possessed; (4) whether the weapon is stolen; (5) the status of the possession (legitimate or illegal); (6) whether the gun is loaded; (7) proximity to drugs or drug profits; and (8) the time and circumstances under which the gun is found." *Id*. (citing *United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008)).

In this case, there is absolutely no doubt that there is—at the very least—"some nexus" between the firearms found in the north shed and Bedenfield's heroin trafficking. The guns were found in the exact same trash can as baggies of heroin that Bedenfield intended to distribute: the guns and heroin were literally on top of each other. Additionally, at least three of those guns were loaded and all five were semi-automatic handguns. Both the volume and type of weapons

11

found suggest that these were not used for ordinary personal protection, but rather "to thwart those who might try to relieve [Bedenfield] of his inventory and profits." *See United States v. Fouse*, 578 F.3d 643, 651 (7th Cir. 2009). Moreover, in addition to the drugs and guns, officers recovered other drug trafficking paraphernalia from that same trash can, including a money counter, two heat sealers, a blender, two containers of lactose, narcotics packaging, and three digital scales. The guns were near all of the tools necessary for the drug trafficking crime, including the narcotics: there is no question that they were "strategically located so that [they] were] quickly and easily available for use." *Duran*, 407 F.3d at 840 (internal citation and quotation marks omitted). Review of all the evidence leads the Court to find that there is no reasonable doubt that Bedenfield possessed the five firearms recovered from the north shed in furtherance of a drug trafficking crime. He is guilty of Count 19.

## CONCLUSION

For the foregoing reasons, the Court finds that the government proved beyond a reasonable doubt that Bedenfield is guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and possessing a weapon in furtherance of a crime under 18 U.S.C. § 924(c)(1)(A). The Court hereby enters judgment of guilty against Bedenfield on Counts 18 and 19 of the indictment.

Date: 12/17/2015

Virginia M. Kendall
United States District Judge